# In the United States Court of Federal Claims

No. 19-1378C
(Filed: March 9, 2020)*
*Opinion Originally Filed Under Seal March 2, 2020

| | | |
|---|---|---|
| POPLAR POINT RBBR, LLC, | ) | |
| | ) | Bid Protest; Motion to Supplement the |
| Plaintiff, | ) | Administrative Record; Cross Motions |
| | ) | for Judgment on the Administrative |
| v. | ) | Record; Disparate Treatment; Unstated |
| | ) | Evaluation Criteria; Meaningful |
| THE UNITED STATES, | ) | Discussions |
| | ) | |
| Defendant. | ) | |
| | ) | |

*Richard J. Conway*, Washington, DC, for plaintiff. *Michael J. Slattery* and *Sara N. Gerber*, Washington, DC, of counsel.

*Ann C. Motto*, Civil Division, United States Department of Justice, Washington, DC, with whom were *Joseph H. Hunt*, Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Douglas K. Mickle*, Assistant Director, for defendant. *Adetokunbo Falade*, General Services Administration, Washington, DC, of counsel.

## OPINION

**FIRESTONE**, *Senior Judge.*

This bid protest involves the General Services Administration's (GSA) request for

lease proposals (RLP) for the Securities and Exchange Commission's (SEC) new

headquarters in Washington, DC.  At issue is the GSA's evaluation and exclusion from

award consideration of a proposal Poplar Point RBBR, LLC (Poplar Point) submitted in

response to the RLP.  Part of the RLP, as amended, set forth the SEC's requirements for

amenities located near the offeror's proposed buildings.  Poplar Point's proposal was excluded by GSA for failing to satisfy the RLP's amenities provision.

Pending before the court are Poplar Point's second and third motions[1] to supplement the administrative record and the parties' cross motions for judgment on the administrative record.  For the reasons that follow, Poplar Point's motions to supplement the administrative record are **DENIED**.  Poplar Point's motion for judgment on the administrative record is also **DENIED**, and the government's cross motion is **GRANTED**.

## I.     BACKGROUND

### A.     The RLP for SEC Headquarters

The SEC currently leases space for its headquarters in three adjacent buildings located near Union Station in Washington, DC.  The leases expire on September 30, 2023.  AR Tab 46a at 7715.  In anticipation of the expiration of the SEC leases, GSA issued RLP No. 5DC0392 on July 10, 2018, seeking offers for a lease (Lease) of up to 1,274,000 rentable square feet of space to serve as the SEC headquarters.  AR Tab 8 at 112.  Under the RLP, the Lease would have a fifteen-year term, with an option to renew for one ten-year renewal term.  *Id.* at 113.  The RLP states that the Lease "will be awarded to the responsible Offeror whose offer" is the "lowest priced technically acceptable offer submitted."  *Id.* at 131.

---

[1] Poplar Point filed its first motion to supplement or complete the administrative record on October 7, 2019.  The court denied this motion on October 28, 2019.  *See* Order, ECF No. 27 (public version).

The RLP permits offerors to propose building sites within six different areas of the Central Employment Area of Washington, DC, including an as yet undeveloped portion of the Anacostia neighborhood in Southeast DC.  *Id.* at 113.  The RLP permits offerors to propose existing buildings that meet, or can be modified to meet, the RLP requirements, or new construction.  *Id.* at 112.

Section 1.05(B) of the RLP, as originally worded, required each offeror to demonstrate that certain amenities would be located near the offeror's proposed building site to serve SEC employees and visitors.  AR Tab 8 at 114.  The amenities provision stated as follows:

> To meet the needs of SEC's employees, and the significant number of out of town and local visitors to SEC, amenities are to be located within the immediate vicinity of each offered building, but not to exceed 2,640 [walking linear feet] measured along accessibility compliant, paved pedestrian pathways from the main entrance of an offered building to the main entrance of the amenity, in sufficient size and number capable of accommodating the demand imposed by a facility of 4,500 employees and guests (or in the case of a multiple building solution, that building's proportional share of employees and guests) such as:
>
> * A variety of fast-food, moderately priced dine-in, and table-service restaurants[], operating during early morning and evening hours as well as during a normal business day so as to provide a variety of options for breakfast, lunch, and dinner
> * USPS post office or mailing facility (e.g., FedEx, UPS, etc.)
> * Pharmacy
> * Dry cleaners
> * Coffee shop(s)
> * Bank(s)

AR Tab 8 at 114.

The amenities provision also identified what offerors needed to demonstrate to satisfy the amenities requirement, stating:

> To meet these requirements, amenities must currently exist or the offeror must demonstrate to the reasonable satisfaction of the Government (i.e., through evidence of signed leases, construction contracts, letters of intent, etc.) that such amenities will exist by the Government's required occupancy date. The [Contracting Officer] may, at his or her sole discretion, accept evidence of amenities for which the offeror agrees to be contractually obligated to provide if awarded the lease. In such instances, those offered amenities shall be included in the final contract documents and subject to enforcement in accordance with the terms of the lease.

*Id.*

On September 4, 2018, Poplar Point and […] other offerors, Property Group Partners (PGP) and […], submitted initial proposals. AR Tab 10a at 275, AR Tab 11 at 2408, AR Tab 12a at 3154. Poplar Point proposed to construct "Columbian Quarter," a new building within the Anacostia neighborhood. AR Tab 10a at 275-78, 361-62, 368-69; AR Tab 46c at 8047-49. PGP submitted a proposal […]. AR Tab 12a at 3154-56. […]. AR Tab 11 at 2408-09. Whereas PGP and […] proposed sites within developed areas of downtown DC, Poplar Point's proposed building site is located in a less developed area. However, Poplar Point's site is located within a federal Opportunity Zone, a program providing tax incentives for commercial projects to locate in low-income communities. […]. *See* Pl.'s Mot. at 6 & n.1; *see also* AR Tab 17 at 3999; AR Tab 18 at 4008; AR Tab 19 at 4017.

B.      **Initial Offers' Amenities Proposals**

In its initial offer, Poplar Point proposed meeting the amenities requirements of the RLP by constructing and maintaining throughout the Lease term […] square feet of retail space.  AR Tab 10a at 371.  This calculation was based on analyses performed by two consultants, although Poplar Point did not include the analyses in its proposal.  *Id.* Poplar Point's amenities narrative stated that the retail space would contain multiple fast casual restaurants, a deli, coffee shop, dry cleaner, sundry shop, bank, and ATM.  *Id.* Poplar Point included ten "letters of interest" from potential tenants.  *Id.* at 371-93.

[…] in its initial proposal identified over one hundred existing amenities located near its proposed site.  AR Tab 11 at 2582-83.  […] proposal did not set forth the operating hours of the amenities.  *Id.*  PGP's proposal identified over one hundred amenities located within or near the SEC's current headquarters, but also did not set forth the operating hours of the amenities.  AR Tab 12b at 3815, 3888-92.

C.      **Discussions with Offerors**

After receiving initial proposals, GSA conducted in-person discussions with Poplar Point on October 23, 2018.  *See* AR Tab 46c at 8015.  During discussions, GSA stated that it considered Poplar Point's proposed amenities to be a major deficiency because Poplar Point had not established that its proposed amenities would be adequate to meet the SEC's demand.  *Id.* at 8016; AR Tab 25 at 4055.  GSA told Poplar Point that the ten "letters of interest" were insufficient because they were non-binding, and some lacked original signatures.  *Id.*  GSA stated that Poplar Point needed to demonstrate the adequacy of its proposed […] square feet of retail space and include a pharmacy and post

office.  *Id.*  According to notes taken during these discussions, GSA stated that there had

to be some "surety" regarding amenities at Poplar Point's proposed site.  AR Tab 46c at

8017.  Poplar Point stated during discussions that it could "guarantee retail or subsidize

until 3rd party active retail" was established.  *Id.*  GSA responded by stating that the

suggestion of a guarantee "has been legally and substantially strong."  *Id.*

On December 20, 2018, GSA sent Poplar Point a letter summarizing the

discussions and the deficiencies in Poplar Point's proposal.  AR Tab 25 at 4055-56.  This

letter stated that amenities were a major deficiency at Poplar Point's proposed site but did

not mention a written guarantee.  *Id.*  GSA also conducted discussions with PGP and […]

in October 2018.  On December 20, 2018, GSA sent deficiency letters to both.  AR Tab

26 at 4058-59; AR Tab 27 at 4060-62.  The letters do not identify any amenities

deficiencies.  *Id.*

### D.   Amendment to Amenities Provision

On December 20, 2018, the same day that GSA issued the offerors' deficiency

letters, GSA issued RLP Amendment No. 0001.  AR Tab 9 at 271.  Amendment No.

0001 amended the amenities provision as follows:

> To meet these requirements, amenities must currently exist or the offeror must
> demonstrate to the reasonable satisfaction of the Government (i.e., through
> evidence of signed leases, construction contracts, letters of intent, etc.) that such
> amenities will exist by the Government's required occupancy date, *and are
> substantially likely to remain active and viable at that location throughout the
> term of the Lease*.  The [Contracting Officer] may, at his or her sole discretion,
> accept evidence of amenities for which the offeror agrees to be contractually
> obligated to provide if awarded the lease.  In such instances, those offered
> amenities shall be included in the final contract documents and subject to
> enforcement in accordance with the terms of the lease.

*Id.* at 271-72 (emphasis added).

### E. Revised Proposals

On January 25, 2019, Poplar Point submitted a revised proposal.  AR Tab 28 at 4063.  Poplar Point included a written and signed "Guarantee of Amenities" in which Poplar Point "committ[ed] as part of this Revised Offer to construct and operate the necessary facilities to provide the full range of amenities required."  *Id.* at 4133.  The guarantee noted that Poplar Point "understands and agrees that this obligation will be included in any lease awarded . . . in response to the RLP."  *Id.*

Poplar Point's revised proposal indicated that the "guarantee to provide and operate the required amenities is not contingent on any third-party agreements," but stated that Poplar Point had received the 10 letters of interest included in its original proposal.  *Id.*  The revised proposal also included two additional "letters of understanding" expressing interest in providing amenities: one from a bank, and one from an amenities and service company, […], to oversee the provision of amenities.  *Id.* at 4133-35.  The letter of understanding from […] stated that it intended to provide amenities including "Employee Dining," but the letter did not explain what employee dining entailed.  *Id.* at 4135.  Poplar Point also increased the amount of proposed retail space from […] square feet to about […] square feet.  *Id.* at 4133.

Property Group Parties and […] submitted their revised proposals on January 25, 2019, and neither provided any additional information regarding amenities.  AR Tab 29 at 4200-03; AR Tab 30 at 5050.

### F.      Elimination of Poplar Point from Award

On May 20, 2019, GSA notified Poplar Point that its "offer will not be further considered for award under the RLP" because it "failed to demonstrate that [Poplar Point] meet[s] or can meet the requirements outlined in Section 1.05[, the amenities provision]." AR Tab 37 at 7607.  GSA concluded that Poplar Point's offer "entirely fails to establish, as is required by the RLP, that [the proposed] amenities will remain active and viable throughout the term of the lease."  *Id.*

In a May 17, 2019 Findings and Determination Memorandum, the Contracting Officer explained that the evidentiary requirements of the amenities provision are necessary to "ensure that Government employees, contractors, visitors, and guests, have adequate facilities to enjoy meals, run errands, and accomplish their mission with efficiency, by utilizing amenities that are proximately located to the building."  AR Tab 46c at 8057.  The Contracting Officer noted deficiencies in Poplar Point's evidence of amenities, including that the letters of interest submitted by Poplar Point were non-binding form letters, the revised offer did not provide information to enable GSA to determine if the amount of proposed retail space was sufficient, the proposal did not clearly explain what amenities would be operated in the proposed amenities building, and the "Guarantee of Amenities" was vague and provided no real recourse to the government in the event of breach.  *Id.* at 8057-60.

8

### G.      Poplar Point's United States Government Accountability Office Protests

On May 30, 2019, Poplar Point filed a protest at the United States Government Accountability Office (GAO), arguing that GSA's exclusion of Poplar Point from award consideration was arbitrary and capricious and that GSA's discussions with Poplar Point were "fatally flawed."  AR Tab 42 at 7622-23.  On July 11, 2019, Poplar Point filed a supplemental protest with the GAO, arguing that GSA applied unstated evaluation criteria, evaluated proposals in a disparate fashion, and improperly precluded from award those offerors proposing sites without existing amenities.  AR Tab 47 at 8063.  Many of Poplar Point's arguments before the GAO were grounded in its interpretation of the "substantial viability" requirement of the amenities provision as applying to all offerors, not just those offerors proposing sites without existing amenities.  *See* AR Tab 54 at 8219 (GAO decision).

In response to Poplar Point's protest, GSA filed an "Agency Report and Memorandum" with the GAO, where, *inter alia*, GSA stated that "[t]he RLP requires each offeror to demonstrate that the amenities available at its offered location, as a whole, are sufficient to meet the agency's needs, and substantially likely to remain active and viable throughout the lease term."  AR Tab 46a at 7717.  GSA also stated that the amendment to the amenities provision "clarified that offerors must demonstrate that the amenities 'are substantially likely to remain active and viable at that location throughout the term of the Lease.'" *Id.* at 7718-19.  The Agency Report went on to explain that only offerors proposing sites without existing amenities were required to do so.  *Id.* at 7721.

The Contracting Officer's Statement of Facts and Position submitted to the GAO also stated that, under the amendment to the amenities provision, only "in situations where amenities do not exist" were offerors required to "demonstrate to the reasonable satisfaction of the Government, that such amenities 'are substantially likely to remain active and viable' throughout the term of the Lease."  AR Tab 46b at 7745-46.

### H.    GAO's Decision Denying Poplar Point's Protests

On September 3, 2019, the GAO denied Poplar Point's protest, stating that GSA evaluated Poplar Point's proposal reasonably and in a manner consistent with the RLP's terms.  AR Tab 54 at 8214.  First, in rejecting Poplar Point's interpretation of the RLP, the GAO stated that "the RLP expressly distinguishes between sites with existing amenities and those without existing amenities" and "imposes a significantly higher evidentiary burden on offerors who propose sites lacking some or all of the required amenities."  *Id.* at 8219.  Second, the GAO stated that the letters of intent submitted by Poplar Point were not letters of intent as contemplated by the amenities provision, were "uniformly non-binding," and in some cases not clearly or properly signed by the vendor. *Id.*  The GAO further stated the Poplar Point's argument that GSA applied unstated evaluation criteria was irrational because the letters of interest failed to meet the requirements of the RLP.  *Id.* at 8220.

The GAO also noted that Poplar Point's revised proposal appeared to offer undifferentiated dining area and kitchen space, which "called into question whether the protestor was proposing to provide the required variety of restaurants." *Id.*  The GAO additionally determined that GSA reasonably found that Poplar Point's amenities

guarantee was insufficient. *Id.* at 8221. Moreover, the GAO explained, offerors were on notice by the terms of the RLP that the Contracting Officer had the discretion to accept the evidence of amenities provided by an offeror. *Id.* at 8222.

The GAO also denied Poplar Point's disparate treatment claim, stating that the differences in evaluation stemmed from the fact that Poplar Point was the only offeror to propose a site without any currently existing amenities. *Id.* at 8223. Finally, the GAO determined that GSA conducted meaningful discussions with Poplar Point. *Id.* at 8224.

## I.    Poplar Point's Protest Before this Court

On September 10, 2019, Poplar Point filed a five-count complaint in this court challenging its exclusion from award consideration. Count I alleges that GSA's decision to eliminate it from further consideration was arbitrary and capricious because Poplar Point satisfied the RLP's minimum requirements. Count II alleges that GSA improperly viewed sites without current amenities as *per se* deficient and required those sites to demonstrate an impossibly high standard. Count III alleges that GSA applied unstated evaluation criteria. Count IV alleges that GSA treated Poplar Point in a disparate manner. Count V alleges that GSA failed to conduct meaningful discussions. *See* Compl. at 17-47, ECF No. 1.

On November 12, 2019, Poplar Point filed a motion for judgment on the administrative record. Poplar Point argues that its proposal fully satisfied the amenities requirement, that GSA failed to conduct meaningful discussions with it, that GSA treated offerors in a prejudicially disparate manner by requiring only Poplar Point to demonstrate that its proposed amenities would remain active and viable throughout the course of the

11

Lease period, that GSA improperly viewed sites without current amenities as *per se* deficient and, without notice, imposed a higher burden on Poplar Point, and that GSA applied six unstated evaluation criteria when it evaluated Poplar Point's proposal.  Pl.'s Mot. at 16-45, ECF No. 29.  Poplar Point requests that the court order GSA to revise the RLP "to reflect its true needs and to eliminate all disparate treatment, and allow all offerors to submit revised proposals in response to the revised RLP." *Id.* at 47.

The government has cross-moved for judgment on the administrative record, arguing that GSA's decision to eliminate Poplar Point from consideration was reasonable and in accordance with law.  According to the government, Poplar Point's proposal did not meet the RLP's minimum requirements.  Def.'s Cross-Mot. at 14-27, ECF No. 35. The government further contends that Poplar Point's arguments that GSA improperly viewed sites without amenities as *per se* deficient and imposed a higher burden on Poplar Point are challenges to the terms of the solicitation that Poplar Point has waived, and, in any case, are without merit. *Id.* at 28-30.  The government also argues that GSA did not apply unstated evaluation criteria in evaluating Poplar Point's proposal. *Id.* at 30-39.  As for Poplar Point's disparate treatment claim, the government argues that GSA did not treat Poplar Point in a disparate fashion under the terms of the RLP, which distinguished between offerors proposing sites with existing amenities and those proposing sites without. *Id.* at 40-47.  Finally, the government contends that GSA conducted meaningful discussions with Poplar Point. *Id.* at 48-53.

Poplar Point has also filed two motions to supplement the administrative record with four documents from other GSA procurements and a declaration from Marcy Owens

Test, who was responsible for drafting Poplar Point's initial and revised proposals.

Poplar Point argues that these documents together demonstrate that GSA had a past

practice of accepting written "guarantees" of amenities as meeting the amenities

requirements of similar RLPs.  *See* Pl.'s 2d Mot. Supp., ECF No. 28; Pl.'s 3rd Mot.

Supp., ECF No. 39.  The government opposes the motions to supplement, arguing that

the documents are not required for this court to conduct "effective judicial review."  *See*

Resp. to Pl.'s 2d Mot. Supp., ECF No. 32; Resp. to Pl.'s 3rd Mot. Supp., ECF No. 41.

## II.     STANDARDS OF REVIEW

### A.     Motions to Supplement the Administrative Record

In a bid protest, the "task of the reviewing court is to apply the appropriate

[Administrative Procedure Act (APA)] standard of review, 5 U.S.C. § 706, to the agency

decision based on the record the agency presents to the reviewing court."

*AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1331 (Fed. Cir. 2018)

(quoting *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009)).

"[L]imiting judicial review to the record actually before the agency [guards] against

courts using new evidence to 'convert the arbitrary and capricious standard into

effectively de novo review.'"  *AgustaWestland*, 880 F.3d at 1331 (quoting *Axiom*, 564

F.3d at 1380) (additional citation omitted).  "Supplementation of the record should be

limited to cases in which the omission of extra-record evidence precludes effective

judicial review," i.e., precludes review "consistent with the APA," which may occur "if

the existing record is insufficient to permit meaningful review."  *AgustaWestland*, 880

F.3d 1331 (quoting *Axiom*, 564 F.3d at 1380).  Prior to supplementing the

administrative record, the court is "required to explain why the evidence omitted from the record frustrated judicial review as to the ultimate question of whether" the agency action was arbitrary. *AgustaWestland*, 880 F.3d at 1332.

## B.     Cross Motions for Judgment on the Administrative Record

The court reviews a challenge to a procurement decision to determine whether "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Glenn Def. Marine (Asia), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013) (internal quotation marks and citation omitted). The court reviews agency action to determine if it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See id.* The arbitrary and capricious standard is "highly deferential" and the "protestor bears the burden of proving that a significant error marred the procurement in question." *Id.* (citations and internal quotations omitted). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Ceres Envtl. Servs. v. United States*, 97 Fed. Cl. 277, 308 (2011). This court must sustain an agency action unless the action does not "evinc[e] rational reasoning and consideration of relevant factors." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). An offeror's disagreement with the agency's judgment, without more, is insufficient to establish that the agency acted unreasonably. *Metro. Interpreters and Translators, Inc. v. United States*, 145 Fed. Cl. 495, 509 (2019); *see also Software Eng'g Servs., Corp. v. United States*, 85 Fed. Cl. 547, 555 (2009)

("Offerors carry the burden of presenting an adequately written proposal, and an offeror's

mere disagreement with the agency's judgment concerning the adequacy of the proposal

is not sufficient to establish that the agency acted unreasonably." (internal quotation

marks and citation omitted)).

Further, a party who can object to the terms of a government solicitation

containing a known error and fails to do so prior to the close of the bidding process

waives its ability to raise the same objection subsequently in a bid protest action before

this court. *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir.

2007).

## III.   DISCUSSION

### A.   Poplar Point's Motions to Supplement the Administrative Record are Denied

The court turns first to Poplar Point's two pending motions to supplement the

administrative record.  The first of these pending motions seeks to supplement the record

with four documents:  (1) a 2014 GSA RLP to procure office space for the Transportation

Security Administration (TSA) headquarters, (2) the executed TSA lease, (3) a 2015 GSA

RLP to procure office space for the United States Citizenship and Immigration Services

(USCIS), and (4) the executed USCIS lease.  Pl.'s 2d Mot. Supp. at 1.  The second of

these pending motions seeks to supplement the record with the December 6, 2019

declaration of Marcy Owens Test, stating that Poplar Point relied on the first four

documents in submitting its "Guarantee of Amenities," which Poplar Point asserts meets

the amenities requirements of the RLP at issue in this case.   Pl.'s 3rd Mot. Supp. at 1.

15

Both the TSA and USCIS RLPs contain amenities provisions.  The TSA RLP required offerors to "demonstrate to the Government's reasonable satisfaction that [the required] amenities will exist by the Government's required occupancy date."  Pl.'s 2d Mot. Supp., Ex. A at 2.  The TSA RLP further required offerors to provide "evidence demonstrating amenities do or will exist by the Government's required occupancy date," to include "copies of signed leases, construction contracts, or other documentation as deemed acceptable by the [Contracting Officer.]"  *Id.* at 13.

The USCIS RLP likewise stated that "[a]menities must be existing or the Offeror must demonstrate to the Government's reasonable satisfaction that such amenities will exist by the Government's required occupancy date."  *Id.*, Ex. C at 2.  The USCIS RLP also stated that, if amenities did not exist, "the Offeror shall provide at a minimum Letter[s] of Intent (LOI) from all proposed amenities establishments" that "include the date in which the establishment(s) will be fully operational," as well as development plans and specific site plans.  *Id.*  The USCIS RLP further provided that offerors must provide "evidence demonstrating amenities do or will exist by the Government's required occupancy date," and that "[s]uch evidence shall include copies of signed leases construction contracts, or other documentation as deemed acceptable by the [Contracting Officer]."  *Id.* at 15.

The executed TSA and USCIS leases contain language regarding the amenities each lease awardee intended to provide.  The executed TSA lease stated, "Lessor has committed to providing retail 'outparcel,'" that "[s]uch retail establishments are intended to be fully operational prior to the Government's final phased occupancy," and that if

16

"75% of the retail establishments are not operational," the "Lessor shall provide a shuttle" to nearby retail locations. *Id.*, Ex. B at 5.  The executed USCIS lease stated, "Lessor shall provide a retail 'outparcel,'" that "[a]ll retail establishments are intended to be fully operational prior to the Government's final occupancy," and that "Lessor guarantees that there will be" a certain amount of breakfast and lunch time serving capacity, according to "fulfillment plans" referenced in the lease. *Id.*, Ex. D at 42.

The December 6, 2019 declaration of Marcy Owens Test that Poplar Point seeks to add to the record states that these four procurement documents establish that GSA, as a past practice, "accepted as sufficient proof of amenities simple" commitment statements by offerors, like the "Guarantee of Amenities" submitted by Poplar Point.  Pl.'s 3d Mot. Supp., Ex. A ¶¶ 7-9.

Poplar Point argues that these five documents together are necessary for this court to conduct effective judicial review of GSA's exclusion of Poplar Point's proposal.  Pl.'s 2d Mot. Supp. at 1, 4; Pl.'s 3rd Mot. Supp. at 1, 6-7.  Specifically, Poplar Point contends that these documents establish that Poplar Point relied on GSA's "past practice" of accepting simple statements that an offeror *intends* to provide amenities, like Poplar Point's "Guarantee of Amenities," as meeting the requirements of the amenities provision.  Pl.'s 2d Mot. Supp. at 4; Reply to Pl.'s 2d Mot. Supp. at 7, ECF No. 33.  Poplar Point further argues that this court has "permitted supplementation of the record to demonstrate a pattern of [a]gency practice" in bid protest cases and should do so again here.  Reply to Pl.'s 2d Mot. Supp. at 5 (citing *Int'l Resource Recovery, Inc. v. United States*, 59 Fed. Cl. 537 (2004)).

17

The government objects to Poplar Point's motions to supplement on the grounds that the court does not need this evidence to conduct effective judicial review.  The court agrees.  First, as the government argues, Resp. to Pl.'s 2d Mot. Supp. at 4, generally, every procurement stands on its own, and GSA is not bound by its actions in a previous procurement.  *Guardian Moving & Storage Co. v. United States*, 122 Fed. Cl. 117, 132 (2015) ("[E]ach procurement must stand or fall on its own administrative record."), *aff'd*, 657 F. App'x 1018 (Fed. Cir. 2016); *see also Eskridge & Assocs. v. United States*, 142 Fed. Cl. 410, 424 (2019) (rejecting protestor's "attempts to connect" a prior 2016 solicitation to the challenged one); *Ultra Elecs. Ocean Sys. Inc. v. United States*, 139 Fed. Cl. 517, 531 (2018) ("[I]n this Court's view, contracting officers have no obligation to explain or distinguish past procurement decisions when making determinations under new procurements.").  The relevant inquiry in this case is whether GSA's decision to eliminate Poplar Point from further consideration based on its failure to meet the amenities requirement was reasonable and consistent with the RLP's terms for this procurement.  The TSA and USCIS lease procurements from 2014 and 2015 were not referenced by the GSA in the subject RLP and are irrelevant to the court's determination.

Second, as the government argues, the four procurement documents do not provide evidence of "past agency practice" relevant to this case because the terms of the TSA and USCIS RLPs differ from the terms of the SEC RLP at issue here.  *See* Resp. to Pl.'s 3rd Mot. Supp. at 3.  Both the USCIS and TSA RLPs required offerors to "demonstrate to the Government's reasonable satisfaction that . . . amenities will exist by the Government's required occupancy date."  Pl.'s 2d Mot. Supp., Ex. A at 2, Ex. C at 2.

By contrast, the RLP here requires offerors like Poplar Point not only to demonstrate that the required amenities will exist by the government's required occupancy date, but also to show that the amenities are substantially likely to remain active and viable at the proposed location throughout the term of the Lease.  AR Tab 9 at 272.  The minimum requirements for this RLP are different from the requirements of the USCIS and TSA RLPs, such that the evidence GSA accepted for those prior RLPs cannot establish a relevant "past practice."

Third, although Poplar Point contends that the evidence provided by the USCIS and TSA awardees "was very similar to [the evidence] provided by Poplar Point here," Pl.'s 2d Mot. Supp. at 3, the documents Poplar Point seeks to add to the record do not include the actual evidence of amenities submitted by the USCIS and TSA lease awardees, *see* Resp. to Pl.'s 2d Mot. Supp. at 6.  True, the executed TSA and USCIS leases themselves contain statements that the awardees would guarantee the requisite amenities.  But both the USCIS and TSA RLPs also required evidence of amenities in the form of "signed leases, constructions documents, or other documentation deemed acceptable" by the contracting officer.  Pl.'s 2d Mot. Supp. at Ex. A at 13, Ex. C at 15.  The USCIS RLP further provided for evidence in the form of letters of intent and development plans.  *Id.*, Ex. C at 2.  Regardless of the terms of the executed leases, the court does not know the full scope of the evidence the awardees actually submitted in response to the TSA and USCIS RLPs.  As a result, the court has no way of comparing the evidence submitted in response to the TSA and USCIS RLPs to the evidence

submitted by Poplar Point and therefore cannot determine whether the agency deviated from its past practices for the RLP in this case.

In sum, the four procurement documents provided by Poplar Point do not establish a past practice relevant to GSA's challenged action in this case.[2]  Therefore, their absence from the administrative record does not preclude meaningful judicial review and the court will not supplement the administrative record with these documents.  *AgustaWestland*, 880 F.3d at 1331.  Because the court declines to supplement the administrative record with these four procurement documents, the court also declines to supplement the administrative record with Ms. Owen Test's declaration, which relies on the four procurement documents.[3]  Poplar Point's motions to supplement the record are denied.

---

[2] For this reason, this case is also distinguishable from *International Resource Recovery, Inc. v. United States*, 59 Fed. Cl. 537 (2004), which Poplar Point relies on here.  The issue in *International Resource Recovery* was whether the contracting officer reasonably eliminated the plaintiff "on the sole ground that it failed to submit a mobilization plan in its proposal," where the plaintiff alleged that "the same [contracting officer] as a matter of past practice did not require mobilization plans from incumbents under substantially similar solicitations."  59 Fed. Cl. at 539.  The court permitted the plaintiff to supplement the administrative record with evidence of a past practice of the agency to allow incumbents to forego submitting mobilization plans.  *Id.* at 543.  Notably, however, the court later held that reliance on past agency practice "was not reasonable in the face of a solicitation that clearly required a mobilization plan."  *Int'l Res. Recovery, Inc. v. United States*, 60 Fed. Cl. 1, 8 (2004).  Any reliance by Poplar Point on the agency's past practice based on the USCIS and TSA RLPs and leases would also be unreasonable, as the amenities requirements of those RLPs were different from the amenities requirement of the RLP at issue in this case.

[3] Moreover, this court has refused to supplement the administrative record with declarations, like Ms. Owen Test's declaration, that contain post-hoc contentions of fact and argument.  *See PlanetSpace, Inc. v. United States*, 90 Fed. Cl. 1, 6 (2009) (holding that a declaration "devoted entirely to re-arguing the merits of [the agency's award decision]" is "prototypical of the kind of extra-record evidence against which the court must guard").

**B.      Poplar Point's Motion for Judgment on the Administrative Record is Denied, and the Government's Cross Motion is Granted**

Turning next to the parties' cross motions for judgment on the administrative record, some of the disputes between the parties turn on the interpretation of the amenities provision, as amended, in the RLP.  The court will first address the interpretation of the amenities provision and then Poplar Point's specific challenges to GSA's decision to exclude Poplar Point from award consideration.

**i.      The RLP patently distinguishes between sites with existing amenities and those without existing amenities.**

Many of Poplar Point's arguments in this protest are grounded in its interpretation of the RLP's amended amenities provision's "substantial viability" requirement as applying to *all* offerors, not just those proposing sites without existing amenities like Poplar Point.  Pl.'s Resp. at 8, ECF No. 38.  The government disagrees, arguing that, under the terms of the RLP, only offerors proposing sites without existing amenities were required to meet the "substantial viability" requirement.  *See, e.g.*, Def.'s Reply at 7-8, ECF No. 40.  The court resolves this question first.

The interpretation of the terms of a solicitation is a question of law for the court. *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004).  The text of the solicitation must be accorded its plain and ordinary meaning.  *Id.*  The court "must interpret a [solicitation] as a whole and in a manner which gives reasonable meaning to all parts and avoids conflict or surplusage of its provisions."  *Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1353 (Fed. Cir. 2006) (internal

quotation marks and citation omitted).  An "interpretation that gives meaning to all parts of the [solicitation] is to be preferred over one that leaves a portion of the [solicitation] useless, inexplicable, void, or superfluous." *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004).

Divergence between the parties' subjective interpretations does not, by itself, render a solicitation ambiguous. *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 751 (Fed. Cir. 1999).  "Both interpretations must fall within a zone of reasonableness." *Id.* (internal quotation marks omitted).  The court must determine whether the solicitation, when read as a whole, "plainly supports only one reading or supports more than one reading and is ambiguous." *NVT Techs.*, 370 F.3d at 1159.

Applying these standards, the court concludes that the RLP's amended amenities provision plainly differentiates between locations where amenities currently exist and locations where amenities do not currently exist.  The amenities provision as amended reads:

> To meet these requirements, amenities must currently exist *or* the offeror must demonstrate to the reasonable satisfaction of the Government (i.e., through evidence of signed leases, construction contracts, letters of intent, etc.) that such amenities will exist by the Government's required occupancy date, and are substantially likely to remain active and viable at that location throughout the term of the Lease.

AR Tab 9 at 272 (emphasis added).  This provision patently and unambiguously distinguishes between sites with existing amenities and those without existing amenities. *Id.* ("amenities must currently exist *or* . . ." (emphasis added)).  The provision also patently and unambiguously imposes a different evidentiary burden on offerors who

propose sites without existing amenities, requiring them to "demonstrate" that the amenities will exist and are substantially likely to remain active and viable throughout the Lease term.  *Id.*  The plain language of the amenities provision supports the government's and the GAO's reading of the solicitation.  AR Tab 54 at 8219 (GAO decision[4] holding that Poplar Point's interpretation "reflects a fundamental misreading of the solicitation").

Poplar Point's interpretation – that the "substantial viability" requirement applies to *all* offerors – is unreasonable, for two reasons.  First, Poplar Point's interpretation ignores the phrase "amenities must currently exist *or* . . ." in the RLP.  AR Tab 9 at 272 (emphasis added).  The amenities provision uses the word "or" to signify and separate two proposal alternatives—proposals for sites with existing amenities and those without.  To require offerors proposing sites with existing amenities to *also* meet the requirements for proposals without existing amenities would render superfluous the phrase "amenities must currently exist or . . . ."  *See, e.g.*, *Gardiner*, 467 F.3d at 1353; *NVT Techs.*, 370 F.3d at 1159.

Second, Poplar Point's interpretation is not otherwise supported by the record.  Poplar Point does not identify other provisions in the solicitation that would bolster its interpretation of the amenities provision.  Rather, Poplar Point contends that the fact that amenities currently exist near an offeror's site "is no indication or guarantee that these

---

[4] GAO decisions are not binding on this court but are normally accorded deference in recognition of the GAO's expertise and experience in resolving procurement decisions.  *See Global Comput. Enters., Inc. v. United States*, 88 Fed. Cl. 350, 412 (2009) (citing cases); *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1038 n.4 (Fed. Cir. 2009) (GAO decisions are not binding authority, but may be "instructive in the area of bid protests.").

establishments will remain active and viable" for the Lease term, so that the "substantial viability" requirement must apply to offerors with existing amenities as well.  Pl.'s Resp. at 8.  This conclusory statement, however, is insufficient to overcome the plain terms of the solicitation.  *See Metric Constructors*, 169 F.3d at 752 (holding that a party's subjective interpretation does not render a provision ambiguous).

In addition, in support of this statement, Poplar Point relies on two studies that it argues demonstrate that most restaurants close during the first year of operation.  Pl.'s Resp. at 8-10.  Poplar Point does not, however, show why these general studies are applicable to the specific sites proposed by […] and PGP, which both offered over one hundred amenities in the area of their proposed sites.  *See* AR Tab 11 at 2582-83; AR Tab 12b at 3815, 3888-92.  Moreover, the studies cited by Poplar Point are not in the record and cannot be considered by the court.  *Banknote*, 365 F.3d at 1353 (holding that extrinsic evidence may not be used to import ambiguity into unambiguous solicitation language); *Axiom*, 564 F.3d at 1374 ("The purpose of limiting review to the record actually before the agency is to guard against courts using new evidence to convert the arbitrary and capricious standard into effectively de novo review." (internal quotation marks and citation omitted)).

For these reasons, the court concludes that the amenities provision plainly and unambiguously distinguishes between proposals for sites with currently existing amenities and those without and imposes the heightened "substantial viability" requirement on only those proposals without existing amenities, like Poplar Point's proposal.  The court now turns to Poplar Point's remaining challenges.

###### ii.      GSA did not treat Poplar Point in a disparate manner.

Poplar Point first argues that GSA treated it in a disparate manner by requiring Poplar Point, but no other offeror, to demonstrate that the amenities near its site would remain active and viable throughout the course of the Lease.  Pl.'s Mot. at 30-31; Pl.'s Resp. at 8, 10.  A contracting agency must "treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria." *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 383 (2003).  However, equal treatment "does not require that all proposals be treated the same."  *Mil-Mar Century Corp. v. United States*, 111 Fed. Cl. 508, 530 (2013) (citation omitted).  A protestor cannot maintain a claim of disparate treatment where there are "meaningful differences" between proposals.  *Active Network, LLC v. United States*, 130 Fed. Cl. 421, 430-31 (2017) (protestor's disparate treatment claim failed where the other offeror's proposal contained meaningful differences and was "sufficiently more detailed and comprehensive" than the protestor's proposal).

Poplar Point's argument that the amenities provision's "substantial viability" requirement was applied to it in a disparate manner is grounded in its misinterpretation of the RLP's terms and must be rejected.  As discussed above, the terms of the RLP expressly impose a different evidentiary standard on sites without existing amenities as compared to sites with existing amenities.  AR Tab 9 at 272.  Under the RLP, those

proposals without currently existing amenities had to additionally meet the amenities provision's "substantial viability" requirement.[5]  *Id.*

Poplar Point was the only offeror to propose a location without existing amenities. The other […] offerors proposed locations in downtown Washington, DC and provided lists of over one hundred independent amenities vendors located in and around their proposed facilities.  AR Tab 12a at 3158; AR Tab 11 at 2409; AR Tab 12b at 3888-91; AR Tab 11 at 2581-83.  GSA therefore could not have treated Poplar Point in an improperly disparate fashion, because, by the terms of the RLP, Poplar Point had to provide "meaningfully different" kinds of evidence than the other […] offerors.  *See Active Network*, 130 Fed. Cl. at 430; *see also* AR Tab 54 at 8224 (GAO decision holding that "the fact that the agency requested more and different kinds of evidence of amenities from the protester than it did for other offerors does not demonstrate impermissible disparate treatment because the RLP imposed a different evidentiary standard on offerors like the protestor than it did on other offerors").  GSA did not treat Poplar Point unfairly when requiring that only Poplar Point meet the amenities provision's "substantial viability" requirement because GSA was simply applying the explicit terms of the RLP.

---

[5] To the extent Poplar Point is challenging as unreasonable the heightened evidentiary requirements for offerors without existing amenities, *see* Pl.'s Mot. at 31 (arguing "there is no factual or logical reason in the RLP as to why those offerors proposing sites near existing amenities do not have to demonstrate the viability of their amenities"), that challenge has been waived.  As discussed above, the solicitation patently and unambiguously imposed different evidentiary burdens depending on whether offerors proposed sites with or without existing amenities.  Poplar Point failed to raise objections to the terms of the amenities provision before GSA and has waived its right to do so now.  *See Blue & Gold*, 492 F.3d at 1313.

Poplar Point further argues that GSA engaged in prejudicial disparate treatment by penalizing Poplar Point, but not the other offerors, for failing to provide the operating hours of its amenities.  Pl.'s Mot. at 32-33.  The RLP requires that amenities operate during morning, business, and evening hours.  AR Tab 9 at 271.  GSA explained before the GAO that it eliminated Poplar Point's offer in part because Poplar Point did not include any information about hours of operation in its proposal.  AR Tab 46a at 7722. Poplar Point argues that the other […] offerors also did not provide the hours of operation of their existing amenities in their proposals but were not penalized for failing to do so, and that, therefore, Poplar Point was treated improperly.  Pl.'s Mot. at 32-33.

The court disagrees.  GSA's treatment of Poplar Point in this regard was reasonable and stemmed from meaningful differences in Poplar Point's proposal.  In its revised offer, Poplar Point proposed the use of […], a single cafeteria-like operator, to satisfy the RLP's amenities requirements.  AR Tab 28 at 4133.  However, Poplar Point's proposal did not include any detail about how […] would operate.  As GSA explained before the GAO, Poplar Point's "offer to provide […] SF of dedicated amenities space did not include any information about the number of retailers that would occupy the space, the function of each retailer . . ., the hours of operation . . ., or the size and capacity of each retailer – all information the [Contracting Officer] would need to reasonably assess whether Poplar Point could provide the set of amenities contemplated by the RLP."  AR Tab 46a at 7722 (GAO agency report and memorandum).  In contrast, the other […] offerors provided lists of over one hundred amenities near their facilities, including well-known, national vendors.  AR Tab 12b at 3888-91; AR Tab 11 at 2581-83.

27

GSA's need for the hours of operation for Poplar Point's proposal only was not unreasonable given that only one operator would be managing its amenities, as opposed to hundreds of independent vendors.

Finally, the record demonstrates that GSA did, in fact, "confirm[] that all locations with the exception of Columbian Quarter [(Poplar Point's proposed location)], have multiple food service establishments operating during early morning and evening hours, including multiple options for table service restaurants." AR Tab 46c at 8047. In its response and reply brief, Poplar Point does not address the meaningful differences in its proposal regarding the number of amenities vendors or GSA's confirmation of the hours of operations for the existing amenities at the other […] offerors' sites. For these reasons, the court concludes that GSA did not treat Poplar Point in a disparate manner, and Poplar Point's protest on this ground is denied.

### iii. GSA did not improperly view sites without current amenities as automatically deficient or require them to satisfy an impossibly high standard.

Poplar Point next argues that GSA violated the terms of the RLP by viewing sites without current amenities as automatically deficient. Pl.'s Mot. at 33. In support, Poplar Point relies on the following statement made by the GSA Contracting Officer before the GAO:

> The language under RLP 1.05(B) [(the amenities provision)] *assumes the existence* of an established set of amenities located within the immediate vicinity of each offered building. Where certain types of amenities do not exist, an offeror may *overcome this deficiency* by demonstrating, to the reasonable satisfaction of the Government, that such amenities will exist by the Government's required

occupancy date, "through evidence of signed leases, construction contracts, letters of intent, etc."

AR Tab 46b at 7741 (emphasis added); *see, e.g.*, Pl.'s Resp. at 13-14. The GSA Contracting Officer went on to state, "An offeror may very well supplement an identified deficiency with an array of existing amenities in the subject market but the burden and risks are much greater to fill such a void in its entirety." *Id.* at 7747. Discussing Poplar Point's proposal to use a single vendor, the GSA Contracting Officer further stated that "the total lack of existing amenities, creates a high bar for a single provider to overcome in fulfilling minimum requirements under [the amenities provision] of the RLP." *Id.* According to Poplar Point, these statements together demonstrate that GSA "improperly evaluated proposals offering sites with no current amenities as *per se* 'deficient,'" Pl.'s Mot. at 34, an "undisclosed" evaluation criteria, Pl.'s Resp. at 13.

The court again disagrees. To the extent that Poplar Point is challenging the *terms* of the amenities provision as providing for an "impossibly high" evidentiary standard, those challenges are waived. As discussed above, *see supra* note 5, a party who can object to the terms of a government solicitation before the close of the bidding process and fails to do so waives its ability to raise the same objection in a bid protest action before this court. *Blue & Gold*, 492 F.3d at 1313. Poplar Point was on notice, since at least its deficiency letter, that the government required heightened evidence of

29

"committed future amenities" under the RLP.  AR Tab 25 at 4055.  However, Poplar

Point did not object to the terms of the RLP to GSA.[6]

To the extent that Poplar Point is arguing that GSA concluded that sites without

existing amenities were "automatically deficient," and then improperly applied this

unstated "automatic deficiency" standard to Poplar Point's proposal, the court finds that

Poplar Point's reading of the record is not supported.  As argued by the government and

determined by the GAO, the Contracting Officer's statements relied on by Poplar Point

"do not establish that the agency applied an unstated evaluation criterion.  Instead, they

merely highlight the logical implication of the fact that the RLP, as amended, imposed a

significantly more stringent standard of proof on offerors that proposed sites without

existing amenities."  AR Tab 54 at 8219 (GAO decision); Def.'s Reply at 12.  In other

words, the "deficiency" noted by the Contracting Officer was not an undisclosed,

automatic "deficiency" determination for sites without existing amenities.  *See* AR Tab

46b at 7741.  Rather, the Contracting Officer's statements simply note that sites

"deficient" in existing amenities must satisfy the RLP's heightened evidentiary

requirements.  *See id.*  Because Poplar Point's challenges are either waived or

unsupported by the record, Poplar Point's protest on this ground is denied.

---

[6] To the extent Poplar Point is instead challenging GSA's *evaluation* of the evidence Poplar
Point provided to satisfy the amenities requirement as misapplying the terms of the RLP, *see*
Pl.'s Resp. at 17 (arguing that the Contracting Officer required it "to produce a level of evidence
far in excess of the modicum required by the RLP"), the court discusses that challenge in Part
III.B.iv-v, *infra*.

###### iv.   GSA did not apply unstated evaluation criteria in evaluating Poplar Point's proposal.

Poplar Point next argues that GSA improperly applied six unstated evaluation criteria when evaluating its proposal.  Pl.'s Mot. at 37-44; Pl.'s Resp. at 25-27.  Agencies must evaluate proposals and make awards based on the criteria stated in the solicitation. *Framaco Int'l, Inc. v. United States*, 119 Fed. Cl. 311, 337 (2014).  Where an evaluation is challenged, the court "will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion." *Galen Med. Assocs.*, 369 F.3d at 1330 (internal citation and quotation omitted).  An agency may consider elements that, while not explicitly stated in the solicitation, are "intrinsic to the stated factors." *Coastal Int'l Sec., Inc. v. United States*, 93 Fed. Cl. 502, 531 (2010) (quoting *Banknote Corp.*, 56 Fed. Cl. at 387). Agencies retain "great discretion" in determining the scope of a given evaluation factor. *PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 536 (2010) (quoting *NEQ, LLC v. United States*, 88 Fed. Cl. 38, 48 (2009)).  "[F]or a plaintiff to succeed on a claim of undisclosed evaluation criteria, it must show that the procuring agency used a 'significantly different basis in evaluating the proposals than was disclosed' in the solicitation." *PlanetSpace*, 92 Fed. Cl. at 536-37 (quoting *NEQ*, 88 Fed. Cl. at 48).

To reiterate, the amended amenities provision here required that amenities be in sufficient size and number to be capable of accommodating 4,500 employees, contractors, and guests.  AR Tab 9 at 271-72.  The RLP identified a non-exhaustive list of

amenities, such as a variety of restaurants, a bank, and a pharmacy, and explicitly stated that if amenities do not currently exist, "the offeror must demonstrate to the reasonable satisfaction of the Government (i.e., through evidence of signed leases, construction contracts, letters of intent, etc.) that such amenities will exist by the Government's required occupancy date, and are substantially likely to remain active and viable at that location throughout the term of the Lease." *Id.* at 272.  The amenities provision also stated that the Contracting Officer "may, at his or her sole discretion, accept evidence of amenities for which the offeror agrees to be contractually obligated to provide if awarded the lease." *Id.*  With those terms in mind, the court now addresses Poplar Point's alleged six unstated evaluation criteria and concludes for each that GSA did not use a significantly different basis in evaluating Poplar Point's proposal than was disclosed. *PlanetSpace*, 92 Fed. Cl. at 536.

First, Poplar Point argues that GSA improperly faulted Poplar Point for not providing enough details about how […], its amenities vendor, would operate.  Pl.'s Mot. at 37-39.  In its revised proposal, Poplar Point provided a site plan of an amenities building, to be operated by […], that proposed a certain amount of seating, servery, and kitchen space.  AR Tab 28 at 4136.  Poplar Point also submitted a short "letter of understanding" from […] that expressed an "intent" to provide "Employee Dining, Catering, Coffee Bar, Mail Room Facility, Pharmacy and Dry Cleaning."  AR Tab 28 at 4135.  In rejecting Poplar Point's proposal, the GSA Contracting Officer concluded in part that it was unclear if […] proposed amenities areas were "to be populated with the [ten] individual vendors that expressed interest in [Poplar Point's] initial proposal, or if

32

these areas are to be staffed and run as a food service cafeteria by […]." AR Tab 46b at 7746 (GAO Contracting Officer's statement); *see also* AR Tab 46c at 8060 (Contracting Officer's Findings and Determination Memorandum). According to Poplar Point, requiring these details amounts to an unstated evaluation criterion.

The court disagrees. As the government argues, *see* Def.'s Cross-Mot. at 33, given that the RLP required a variety of restaurants and other amenities operating during morning, afternoon, and evening hours, AR Tab 9 at 271, it is clear from and intrinsic to the RLP's requirements that the agency could weigh and review the function and type of amenities to be provided.

Second, Poplar Point argues that GSA improperly "required" it to submit its consultants' analyses to demonstrate that it could meet the amenities requirements. Pl.'s Mot. at 39-40. In its initial proposal, Poplar Point referenced, but did not submit, two consultants' analyses to support the […] square feet of amenities space it initially proposed. AR Tab 10a at 371. In the deficiency letter sent to Poplar Point, GSA requested any information supporting the adequacy of that amount of retail space, including the consultants' reports. AR Tab 25 at 4055. The deficiency letter noted that Poplar Point had not included the consultants' analyses in its initial offer, and that GSA was thus "unable to determine whether that amount of space is adequate" to meet the SEC's demand. *Id.* However, Poplar Point did not submit these analyses in its revised proposal, where it doubled its proposed amenities square footage from […] square feet to about […] square feet. AR Tab 28 at 4133, 4136. In rejecting Poplar Point's revised proposal, the GSA Contracting Officer in part determined that "Poplar Point did not

afford GSA the opportunity of understanding its rationale in determining the amount of proposed retail . . . ." AR Tab 46b at 7746-47 (GAO Contracting Officer statement). Poplar Point argues that this statement demonstrates that GSA "required" Poplar Point to provide its consultants' reports, which is outside the terms of the solicitation. Pl.'s Mot. at 39-40.

The court concludes that this argument is not supported by the record. Although in rejecting Poplar Point's revised proposal, the Contracting Officer noted that GSA had requested the consultants' analyses, the Contracting Officer also noted that Poplar Point failed to provide "*any* other form of support" for either the initial or revised amount of square footage. AR Tab 46b at 7746-47 (emphasis added). The record therefore demonstrates that GSA did not, as Poplar Point argues, *require* that Poplar Point submit its consultants' analysis. Rather, GSA reasonably requested any support for Poplar Point's proposed amount of amenities space. *Id.*; *see also* AR Tab 46c at 8059 (Contracting Officer's Findings and Determination Memorandum). Moreover, the RLP required amenities sufficient in *size* and number to provide a variety of meal options, and thus explicitly permitted GSA to evaluate the square footage proposed by Poplar Point. AR Tab 9 at 271-72. GSA therefore did not apply unstated evaluation criteria when it noted that Poplar Point failed to support its proposed square footage with its consultants' or any other studies.

Third, Poplar Point argues that GSA unreasonably determined that Poplar Point's letters of intent did not satisfy the RLP's amenities requirement because the RLP did not require legally binding letters of intent. Pl.'s Mot. at 40-42; Pl.'s Resp. at 26. In

eliminating Poplar Point's proposal, GSA determined in part that the "letters of intent were non-binding, identical form letters generated by a retail brokerage, and many lacked an original signature by a representative from the vendor."  AR Tab 46c at 8059 (Contracting Officer's Findings and Determination Memorandum); *see also* AR Tab 46b at 7748 (GAO Contracting Officer statement).  Poplar Point argues that in rejecting this evidence of its amenities, GSA "improperly imposed a higher evidentiary burden on Poplar Point than that set forth in the RLP."  Pl.'s Mot. at 41-42.

Again, the court finds that Poplar Point's argument is not supported.  The RLP explicitly states that Poplar Point must satisfy the amenities provision's requirements "through evidence of signed leases, construction contracts, letters of intent, etc."  AR Tab 9 at 272.  Requesting binding letters of intent is consistent with the stated criteria.  *Id.* Poplar Point seems to imply that to satisfy the RLP's requirements, it needed to provide documents characterized as "letters of intent" and nothing more.  However, GSA was allowed to evaluate the content of the submitted letters in determining whether the amenities proposed by Poplar Point would exist and remain substantially viable throughout the term of the Lease.  *See* AR Tab 54 at 8219-20 (GAO decision finding "unconvincing the protester's argument that merely submitting letters of intent, regardless of their actual terms, was sufficient to meet the requirements of the RLP"); *see also Constellation W., Inc. v. United States*, 125 Fed. Cl. 505, 536 (2015) (for a solicitation requiring capacity planning, monitoring trends and projecting future requirements were intrinsic to capacity planning).

Moreover, as the government argues, and as explained by the GAO, Def.'s Cross-Mot. at 37; AR Tab 54 at 8219-20, Poplar Point did not submit letters of intent, it submitted "letters of interest" and "letters of understanding," AR Tab 10a at 372-391; AR Tab 28 at 4134-35. The court will not substitute its judgment for the agency's in assessing the merits of these letters, particularly given that they in fact deviate from the terms of the RLP. *See Ceres Envtl. Servs.*, 97 Fed. Cl. at 308 ("[I]t is well established that the Court should not substitute its judgment to assess the relative merits of competing proposals in a Government procurement."). And Poplar Point's disagreement with the agency's analysis does not render the agency's decision unreasonable. *See Software Eng'g Servs.*, 85 Fed. Cl. at 555 ("Offerors carry the burden of presenting an adequately written proposal, and an offeror's mere disagreement with the agency's judgment concerning the adequacy of the proposal is not sufficient to establish the agency acted unreasonably." (internal quotation and citation omitted)). In addition, GSA's deficiency letter to Poplar Point explicitly stated that "non-binding expressions of interest from various retail vendors and a retail real estate brokerage are not acceptable proof that the building will meet the" requirements of the RLP. AR Tab 25 at 4055-56. Poplar Point knew, as of the deficiency letter, that non-binding letters of interest would not be sufficient to meet the requirements of the RLP. For these reasons, Poplar Point's challenge regarding the non-binding letters of interest fail.

Fourth, Poplar Point contends that GSA imposed unstated evaluation criteria and an improperly higher, unannounced standard of proof relating to Poplar Point's "Guarantee of Amenities." Pl.'s Mot. at 42-43; Pl.'s Resp. at 27-28. In its revised

proposal, Poplar Point submitted the one-paragraph guarantee in which Poplar Point "committ[ed] as part of this Revised Offer to construct and operate the necessary facilities to provide the full range of amenities required." AR Tab 28 at 4133. The revised proposal noted that Poplar Point "understands and agrees that this obligation will be included in any lease awarded . . . in response to the RLP." *Id.*

In eliminating Poplar Point's proposal, the Contracting Officer concluded that the guarantee was insufficient to meet the amenities requirement because it was "lacking in substance." AR Tab 46b at 7747. The Contracting Officer determined that Poplar Point failed to "provide[] any details about the extent of its obligation to guarantee such amenities, how the guarantee would be enforced, or what the Government's remedy will be if Poplar Point fails to abide by the guarantee . . . For a location with no existing amenities, the Government cannot assess the sufficiency of an offer to meet the substantive requirements of the amenities provision of the solicitation, or the likelihood that the amenities will remain active and viable at the location through the term of the lease, without detailed information backed by a legally enforceable commitment with available recourse and remedies." *Id.* Poplar Point argues that the details requested by the Contracting Officer are unstated evaluation criteria not required by the terms of the RLP. Pl.'s Mot. at 43.

Poplar Point's argument is not supported by the record. The terms of the RLP explicitly require that, for a site without existing amenities, the offeror must demonstrate that amenities would exist at the time of occupancy and continue to exist throughout the Lease term. AR Tab 9 at 271-72. The content of any guarantee of amenities is intrinsic

to the agency's evaluation of this requirement.  *See Constellation W.*, 125 Fed. Cl. at 536.

Moreover, the RLP expressly provided the Contracting Officer with discretion whether to

"accept evidence of amenities for which the offeror agrees to be contractually obligated

to provide if awarded the lease."  AR Tab 9 at 272.  The court concludes that GSA did

not apply unstated evaluation criteria when it evaluated the terms of the guarantee and

reasonably exercised its discretion in rejecting that evidence.

Fifth, Poplar Point argues that GSA applied unstated evaluation criteria by

eliminating Poplar Point's proposal, in part, because […] is a single entity.  Pl.'s Mot. at

42.  In eliminating Poplar Point's proposal, the Contracting Officer noted that the

amenities provision "is essentially a performance/capabilities requirement of the

solicitation, which is typically achieved by the existence of multiple independent

operators of retail establishments within immediate vicinity of the offered building . . .

and in the vast majority of cases, not controlled by a single offeror."  AR Tab 46b at

7747.  Poplar Point argues that nothing in the RLP required the existence of multiple

independent vendors and that it was improper for GSA to consider this evaluation factor.

Pl.'s Mot. at 42.

Again, this argument is not supported by the record.  While noting that

independent vendors were "typically" used to satisfy the amenities requirement, the

Contracting Officer went on to note that Poplar Point instead sought to meet the

amenities requirement through "contracts with a private, third-party operator," but that it

was still incumbent on Poplar Point "to demonstrate its capabilities to satisfy the

performance requirements of the RLP."  AR Tab 46b at 7747.  Contrary to Poplar Point's

contention, the Contracting Officer did not reject Poplar Point's proposal *because* […] was a single entity.  Rather, it is clear from the record that the Contracting Officer ultimately determined that the evidence of amenities submitted by Poplar Point did not satisfy the RLP's requirements.  *Id.*  And as discussed above, the Contracting Officer did not evaluate Poplar Point's proposal using unstated criteria simply by evaluating the content of the evidence Poplar Point submitted.

Sixth and finally, Poplar Point argues that GSA applied unstated evaluation criteria by relying on the report of GSA's consultant, Savills Studley, to evaluate the amenities at all offered locations.  Pl.'s Mot. at 43-44.  The report evaluated Poplar Point's proposed site by considering, among other factors, the number of hotels and grocery stores within the area, the number of daytime employees and residents located within a one-mile radius of the site to determine whether the amenities requirement could be met and sustained over the lease period, and other barriers, such as existing highways, that would limit future development and foot traffic.  AR Tab 46c at 8046-47 (GAO agency report and memorandum); AR Tab 46b at 7748 (GAO Contracting Officer statement).  Poplar Point contends that these factors were not identified as criteria by which the sufficiency of amenities would be evaluated.  Pl.'s Mot. at 43-44.

This argument fails, for three reasons.  First, as discussed, the RLP required offerors to show that amenities would exist by the SEC's occupancy date and throughout the Lease term.  AR Tab 9 at 272.  Evaluating whether Poplar Point's proposed location could sustain viable amenities based on these factors is intrinsic to the stated criteria of demonstrating the continued viability of amenities throughout the Lease term.  The court

finds that it was not unreasonable for the agency to rely on the Savills Studley study to

confirm that Poplar Point could not meet the amenities requirement.  Second, although

the RLP contained a non-exhaustive list of amenities, this list cannot be read as

precluding the agency from considering all amenities, such as hotels and grocery stores,

offered by a particular location.  AR Tab 9 at 271-72.  Finally, the record demonstrates

that Poplar Point was eliminated because its initial and revised offers failed to provide

specific evidence that Poplar Point could meet the amenities requirement, which the

agency then confirmed by conducting its own independent analysis in the Savills Studley

report.  AR Tab 46c at 8059-60 (Contracting Officer's Findings and Determination

Memorandum); AR Tab 46b at 7746-48 (GAO Contracting Officer's statement).  Even if

the agency had not relied on the Savills Studley report, the record demonstrates the

agency would have determined that Poplar Point failed to satisfy the amenities

requirement.

For these reasons, the court concludes that GSA's evaluation of Poplar Point's

proposal was based on criteria that were explicitly disclosed in or intrinsic to the

amenities provision's requirements.  Poplar Point's arguments to the contrary are not

supported by the record.  GSA did not rely on unstated evaluation criteria to eliminate

Poplar Point, and Poplar Point's protest on this ground is denied.

### v.   Poplar Point has not otherwise shown that GSA's disqualification of its proposal was arbitrary and capricious.

Poplar Point next argues that, generally, its revised proposal satisfied the terms of

the RLP and that GSA arbitrarily and capriciously eliminated its proposal from further

award consideration.  Pl.'s Mot. at 16-24.[7]  Poplar Point contends that its revised

proposal, which offered approximately […] square feet of retail amenities space, was

"substantially more than sufficient" to meet the needs of the SEC.  Pl.'s Mot. at 18.  It

further contends that its proposal to use […], together with the other letters of interest and

understanding submitted in its initial and revised proposal, provides evidence of

amenities in sufficient size and number to satisfy the RLP's requirements.  *Id.* at 18-19.

In addition, its "Guarantee of Amenities," Poplar Point asserts, meets the "substantial

viability" requirement of the RLP by "expressly obligat[ing] Poplar Point to 'construct

and operate the necessary facilities to provide the full range of amenities required by RLP

Paragraph 1.05.'"  *Id.* at 21 (quoting AR Tab 28 at 4133) (emphasis removed).  Because

of this guarantee, Poplar Point contends, "GSA can seek any and all remedies against

Poplar Point afforded" by the Lease, such as withholding rent payments and terminating

the Lease.  *Id.* at 21-22.

It is well-settled that where an agency's evaluation is challenged, the court will not

evaluate the proposal anew, but instead "examine the agency's evaluation to ensure that it

was reasonable and consistent with the evaluation criteria and applicable statutes and

regulations, since the relative merit of competing proposals is primarily a matter of

administrative discretion."  *Galen Med. Assocs.*, 394 F.3d at 1330 (internal quotation and

citation omitted).  In addition, it is "well established that the Court should not substitute

---

[7] To the extent Poplar Point argues that GSA's rejection of its proposal contradicts established agency practice, Pl.'s Mot. at 24-26, this argument relies on materials that the court has concluded are outside the administrative record in this case.  *See supra* Part III.A.  The court therefore disregards this argument.

its judgment" for the agency.  *Ceres Envtl. Servs.*, 97 Fed. Cl. at 308.  An offeror bears

the burden of presenting an adequately written proposal that satisfies the terms of the

solicitation, *Mercom, Inc. v. United States*, 131 Fed. Cl. 32, 40 (2017), and an offeror's

mere disagreement with an agency's decision does not render that decision unreasonable,

*United Enter. & Assocs. v. United States*, 70 Fed. Cl. 1, 26 (2006); *Software Eng'g*

*Servs.*, 85 Fed. Cl. at 555.

Here, the agency's evaluation of Poplar Point's proposal was reasonable and (as

discussed above) consistent with the RLP's terms.  Neither Poplar Point's initial nor

revised proposal satisfied the amenities provision's requirements.  Poplar Point's initial

proposal included a narrative and ten non-binding, form letters of interest from various

vendors, some of which appeared to be electronically signed.  AR Tab 10a at 370-91.

The narrative stated that Poplar Point had engaged two consultants and determined the

need for […] square feet of retail space, which included two "interim structures," but did

not include the underlying studies.  *Id.* at 371.

The agency reasonably determined that Poplar Point's initial amenities proposal

was deficient.  Poplar Point did not provide the studies from its consultants or any other

evidence justifying how […] square feet of retail space would be sufficient to satisfy the

RLP's requirements.  AR Tab 46c at 8016-17 (notes of GSA discussions with Poplar

Point).  Poplar Point did not provide any detail about the design of the "interim"

structures or any detailed information about what vendors would fill the permanent and

interim structures.  AR Tab 46b at 7743 (GAO Contracting Officer statement that "no

determination could be made as to whether these structures were of suitable construction

for a retail tenant to consider leasing or sufficient to support the SEC's needs"). The

letters of interest submitted by Poplar Point were non-binding and similar in form, and at

least five had computer-generated signatures. AR Tab 20b at 4029 (GSA discussion

agenda); AR Tab 13 at 3967 (GSA abstract of Poplar Point's initial proposal); *see* AR

Tab 10a at 375-389 (letters of interest submitted with Poplar Point's initial proposal).

Moreover, contrary to the requirements of the RLP, the initial proposal did not include or

mention a post office or pharmacy. AR Tab 46b at 7742 (GAO Contracting Officer's

statement). Given the RLP's explicit requirements, the court concludes that it was not

unreasonable for the agency to require more of Poplar Point.

  GSA also reasonably found that Poplar Point's revised offer was inadequate.

The revised proposal additionally included the "Guarantee of Amenities" and two letters

of understanding from a credit union and […], as well as an amenities site plan proposing

an additional […] square feet of retail space to include a cafeteria with a kitchen, servery,

and seating area. AR Tab 28 at 4133-36. Poplar Point again did not explain how it

determined that about […] square feet of retail space was adequate to meet the SEC's

needs. AR Tab 28 at 4133; AR Tab 46a at 7723 (GAO agency report and memorandum);

AR Tab 46c at 8059 (Contracting Officer's Findings and Determination Memorandum).

The letters of understanding from […] and the credit union were, similar to the letters of

interest initially provided by Poplar Point, non-binding expressions of interest. AR Tab

46b at 7747-48 (GAO Contracting Officer's statement). Although Poplar Point's

guarantee stated that it would guarantee the amenities requirements, the guarantee did not

provide any detail how it would do so. The guarantee and revised proposal did not

explain which vendors would be included in the retail space (for example, the vendors expressing interest in Poplar Point's initial proposal, or […]), the variety of vendors in that retail space, the hours the proposed cafeteria would operate, or how many seats would be available in the seating area.  AR Tab 46c at 8057-59 (Contracting Officer's Findings and Determination Memorandum); AR Tab 46b at 7746 (GAO Contracting Officer statement).  Importantly, the RLP explicitly granted the Contracting Officer discretion to reject guarantees.  AR Tab 9 at 272 ("The [Contracting Officer] may, at his or her sole discretion, accept evidence of amenities for which the offeror agrees to be contractually obligated to provide if awarded the lease.").  Given the lack of specificity in Poplar Point's revised proposal, the Contracting Officer reasonably rejected Poplar Point's guarantee.  And considering all the evidence before the agency, the Contracting Officer rationally determined that the lack of evidence in Poplar Point's offer "poses unacceptable risks to the Government; risks that it is unwilling to accept."  AR Tab 46c at 8060 (Contracting Officer's Findings and Determination Memorandum).

Poplar Point's arguments challenging the merits of GSA's decision amount to mere disagreements with the agency's analysis, and do not provide a basis for overturning that decision.  *See United Enter. & Assocs.*, 70 Fed. Cl at 26.  Poplar Point focuses on its guarantee, which it argues satisfies the amenities requirement.  *See* Pl.'s Resp. at 21-23.  However, as discussed above, GSA reasonably exercised its explicit discretion under the RLP to reject the guarantee, given the guarantee's and Poplar Point's revised proposal's lack of specific evidence of amenities.  *See Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) ("[C]ompetitors do not dictate an

44

agency's minimum needs, the agency does." (internal quotation and citation omitted)).

This court must "give[] the greatest deference possible to [the agency's] determinations."

*KSC Boss All., LLC v. United States*, 142 Fed. Cl. 368, 380 (2019).  GSA's

determinations were reasonable and consistent with the RLP.  Poplar Point's protest on

this ground is therefore rejected.

### vi.     GSA conducted meaningful discussions with Poplar Point.

Finally, Poplar Point argues that GSA failed conduct meaningful discussions and

misled Poplar Point.  Pl.'s Mot. at 27.  Specifically, Poplar Point contends that the agency

misled Poplar Point into believing that its "Guarantee of Amenities" would satisfy the

RLP's amenities requirement.  *Id.* at 27-29.

In negotiated procurements, "the agency must provide 'meaningful' discussions

that are not misleading."  *Greenland Contractors I/S v. United States*, 131 Fed. Cl. 216,

225 (2017) (internal quotation and citation omitted).  To conduct meaningful discussions,

the agency must "point out weaknesses or deficiencies in a proposal as specifically as

practical considerations permit so that the agency leads the offeror into areas of its

proposal which require amplification or correction."  *ORCA Nw. Real Estate Servs. v.

United States*, 65 Fed. Cl. 1, 9 (2005) (quotation omitted).  However, meaningful

discussions "do not require the agency to identify each and every item that could be

raised as to improve [a] proposal."  *iAccess Techs., Inc. v. United States*, 143 Fed. Cl.

521, 537 (2019) (quotation omitted).  The "scope and extent of discussions are a matter

of contracting officer judgment."  48 C.F.R. § 15.306(d) (Federal Acquisition

Regulation).

Here, the record demonstrates that GSA conducted meaningful discussions with Poplar Point.  In its initial offer, Polar Point's evidence of amenities included an amenities narrative proposing […] square feet of amenities space and the ten letters of interest from various vendors.  AR Tab 10a at 370-93.  GSA addressed both these items in detail during its October 23, 2018 discussions.  AR Tab 46c at 8016 (discussion notes); AR Tab 25 at 4055 (deficiency letter); AR Tab 20b at 4029 (discussion agenda).  GSA told Poplar Point that its letters of interest were insufficient because they were non-binding and included only expressions of interest, and that GSA would need supporting documentation to verify that […] square feet would be adequate.  AR Tab 46c at 8016; AR Tab 25 at 4055.  These discussions meaningfully identified the weaknesses in Poplar Point's initial proposal.  *See ORCA*, 65 Fed. Cl. at 9.  As discussed above, Poplar Point's revised proposal was not eliminated because the agency failed to lead Poplar Point into areas of its proposal that required amplification or revision, but because the revised proposal did not address the agency's concerns.  *See infra* Part III.B.iv-v; *see also* AR Tab 54 at 8225 (GAO decision).

In arguing to the contrary, Poplar Point focuses on the discussions surrounding a possible amenities guarantee,[8] contending that GSA misled Poplar Point into believing that GSA's "concerns about amenities would be resolved if Poplar Point subsidized or

---

[8] Poplar Point argues that GSA's discussions regarding its letters of interest and supporting documentation regarding its proposal square footage were misleading because they applied an "improperly heightened standard of proof beyond the level permitted by the RLP."  Pl.'s Resp. at 7.  As discussed above, the court rejects the argument that GSA required evidence beyond that stated in the RLP.  *See supra* Part III.B.iv.

guaranteed the existence of the amenities required by the RLP."  Pl.'s Resp. at 3-7.  In

support, Poplar Point relies on four sentences in the record.  First, Poplar Point cites an

internal GSA "Discussion Agenda" that was never given to Poplar Point during

discussions, where GSA lists as an item for discussion "Is [Poplar Point] willing to

subsidize amenities in the building and guarantee existence?"  AR Tab 20b at 4028-29.

Next, Poplar Point relies on notes taken during discussions, where a GSA representative

states "there has to be some surety," Poplar Point responds that it "could guarantee retail

or subsidize until 3rd party active retail" and GSA's broker states "the arrangement has

been legal and substantially strong."  AR Tab 46c at 8017.  Together, Poplar Point argues

that these sentences demonstrate that GSA misled it to believe that a simple guarantee of

amenities would satisfy the amenities requirement.  Pl.'s Resp. at 3-4.

Poplar Point's argument is not supported by the record.  *See Banknote Corp.*, 56

Fed. Cl. at 381 (rejecting factual assertions that were simply "not borne out by the

record").  First, the four sentences Poplar Point relies on do not demonstrate that GSA

*promised* to accept any guarantee from Poplar Point regardless of its terms as satisfying

the amenities requirement.  These statements at most show that the possibility of

guarantee was discussed and are not, as Poplar Point argues, a "confusing" directive that

a guarantee would satisfy GSA's concerns.  Pl.'s Resp. at 6.  Second, the record

demonstrates that Poplar Point did not in fact provide the type of guarantee discussed.

Poplar Point's guarantee did not guarantee specific retailers or promise to "subsidize"

retail.  *See* AR Tab 28 at 4133.  Third, Poplar Point's arguments are contradicted by other

parts of the record.  For example, GSA's response to Poplar Point's post-elimination

debriefing questions about the guarantee stated that it "did not prescribe the manner in which an offeror must demonstrate its capability to meet the amenities requirement. Rather, it was up to each offeror to determine how it could satisfy the amenities requirement."  AR Tab 41 at 7620.  Moreover, the agency stated before the GAO that GSA "was not prescriptive in providing Poplar Point a specific solution addressing its deficiency on the offered amenities."  AR Tab 46b at 7745.  For these reasons, Poplar Point's protest based on its challenge regarding the discussions with GSA is rejected.

## IV.   CONCLUSION

For the foregoing reasons, Poplar Point's motions to supplement are **DENIED**. Poplar Point's motion for judgment on the administrative record is **DENIED**, and the government's cross motion is **GRANTED**.  No costs.  The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED**.

s/Nancy B. Firestone
NANCY B. FIRESTONE
Senior Judge